WILLIAMS BROTHERS COMPANY, et al. *v.* McINTOSH, et al.

No. 39909  January 23, 1956  84 So. 2d 692

*Butler, Snow, O'Mara, Stevens & Cannada,* Jackson, for appellants.

*Gartin & Hester,* Laurel, for appellees.

LEE, J.

Mrs. Erma McIntosh and her two children, Grace and Jimmie, age 12 and 9 years, respectively, filed their claim for benefits under the Workmen's Compensation Act on account of the death of their husband and father, Truman McIntosh. The attorney-referee and the Commission disallowed the claim; but, on appeal to the circuit court, the former order was reversed and a judgment was entered awarding the benefits. From that judgment, the employer and its carrier appealed.

McIntosh had been injured in July 1951. A hearing on his claim for disability benefits was held before the attorney-referee on November 25, 1953. At the conclusion of the evidence, the attorney-referee rendered an opinion in which it was stated that McIntosh was in the employ of Williams Brothers on July 18, 1951, and that, "On said date claimant herein, while performing services for the employer, sustained an accidental injury arising out of and in the course of his employment. At the time of the injury claimant was employed as a laborer clearing debris from a pipeline right of way when a limb struck him above his left ear about the part of the hair causing a temporary semi-conscious condition. Claimant worked the remainder of the day and reported the incident to Herman Brown, the right of way foreman. * * * Following the injury, claimant had occasional headaches which became more frequent and severe as time passed. He continued in the employ of Williams Brothers Company until the job was completed in October, 1951, at which time he returned from North Carolina to Meridian. During November, 1951 Claimant experienced a convlusion and when he awoke his tongue had been severely bitten. After the initial convulsion, claimant began experiencing convulsive seizures periodically which occurred mostly at night. Claimant has been under the treatment of Dr. Hackett Bennett of Meridian and Dr. Charles L. Neill of Jackson." The opinion re-

ferred to the medical evidence of Dr. Neill to the effect that the type of injury which the claimant received would cause a condition of epilepsy and that one year after the doctor's first evaluation, and in June 1953, the doctor found a stronger tendency toward convulsive seizures. Payment of total disability benefits from May 29, 1952, was ordered. The employer complied with the order. No appeal was taken to the Commission.

McIntosh died on February 19, 1954, about two days after the performance of a brain operation.

The sole issue is whether or not the injury of July 18, 1951, aggravated or accelerated an existing tumor, and shortened the deceased's life and thus contributed to his death.

In the original report of Dr. Hackett Bennett, which was filed with the Commission on May 15, 1953, it was stated that the patient's history was: "Patient was clearing land for a right of way for company when struck on back of head by falling tree. Patient states he was knocked unconscious for unknown period of time. Slowly became disabled to work in approximately five to seven days after injury." His objective findings were "injury to head and cranial contents as manifested by post traumatic headaches, and convulsive seizures." He was referred to a neuro-surgeon. The certificate of death, signed by Dr. Charles L. Neill, showed that the cause was "astrocytoma tumor of brain right", and that the doctor attended him until it occurred on February 19, 1954.

Several doctors were offered as witnesses in the case. All of them agreed that trauma does not cause a tumor of the nature here described.

Dr. Neill, a neuro-surgeon, testified that his original diagnosis was traumatic epilepsy as a result of a blow on the left side of the head from the limb of a tree. He knew something was wrong in the brain, and he gave it the general term lesion, that is, "an alteration of

normal physiological structure." He did not have sufficient evidence from time to time to make a diagnosis of tumor, but he felt that "there was a definite lesion in that right hemisphere of his brain all of the time, from the first time I saw him, all the way through his treatment." A study which he carried out as of June 23, 1953, was indefinite. A number of electroencephalograms suggested a localized epileptic focus, and he felt that a lesion in that area might be discovered, which could be helped surgically. Consequently he operated to determine the nature, whether malignant or benign, and if it could be removed. By the operation it was disclosed that the trouble was a grade two astrocytoma, extensively and deeply infiltrating the right side of the brain, and beyond the possibility of surgical excision. The surgical specimens were examined. The patient died two days later. The doctor testified that the growth of this kind of tumor is slow; that it had started on McIntosh perhaps 8 or 10 years previously; and that it does not spread to other parts of the body like the ordinary cancer. It was his opinion that trauma will produce a disabling epileptic condition because of bleeding into or about the tumor at the time of the injury and will accelerate death. From the history, his knowledge of the patient and earlier examinations and treatment, he was of the opinion that McIntosh had a hemorrhage into the existing tumor as a result of the head injury; that such alteration produced a more rapid deterioration, convulsions, headaches, etc. than would have occurred if he had not sustained the injury; and that his life was shortened at most four or five years.

Dr. Forrest G. Bratley, a pathologist, Dr. Jack King, a general surgeon, and Dr. Harvey Johnston, a chest and general surgeon, were called as witnesses for the employer. None of these witnesses had made an examination of the injured employee or had any personal

knowledge of his physical condition. Hypothetical questions were propounded to them.

Counsel, on direct, detailed the facts as set out in the finding of the attorney-referee, which appears herein above, except that a limb of a tree "brushed" him rather than "struck" him, with the additional subsequent history, and inquired if the blow was the cause of the tumor. Dr. Bratley, before answering, wanted to know whether this man was knocked out or not. Counsel then said: "My understanding, doctor, is that the most that can be said is that he was in a semi-conscious condition, that is, that he was not knocked unconscious or 'out'; and, as a matter of fact, he continued with his work." Then the attorney-referee read from his finding of fact in the hearing. The doctor then gave it as his opinion that a blow on the head does not cause a tumor and that there was no causal connection between the blow and the death at such a distant time. However, on cross-examination, he was asked if the man had never had headaches before, and he did have them after the injury, if the blow had something to do with the aggravation of the pre-existing trouble, and he frankly replied, "If I have to answer that yes or no, I don't believe that I can answer it." He further said, "It depends upon the severity of this blow, and in view of the fact that the blow did not apparently knock him out I would say that it did not have any relation to it"; and again, "The only reason why I say it does not happen was because he was not knocked out * * *" When he was asked if it was not true that "all the answers you've given so far have been based upon the premises that this man did not receive a serious blow to his head", his answer was, "Yes, that is right."

Likewise, in the question to Dr. King, in describing the blow by the limb on the side of the head, counsel said, "The limb did not fall off or break off the tree and fall on him, but he was brushed on the side of his

head by a limb on the tree. It did not knock him unconscious. He was kind of semi-unconscious for a while there. He did not quit work or lose any time from his work * * * Now it's been said that he had some headaches following this blow.'' And then followed the balance of the history. The doctor replied, ''I don't think anyone could blame any cause or connection between the blow on the head and the tumor * * * The only possible thing that it (the blow) could have produced would perhaps have been hemorrhage. The fellow did not complain of symptoms for at least a period of three months after the blow, if I get the statement correctly.'' But, on cross-examination, when asked if ''trauma may accelerate the growth or development of a tumor'', he at first replied, ''Not that I know of'', but then supposed ''it's possible, but highly improbable.'' When he was asked, ''did you answer that with the idea that the man had a very slight blow on the head'', he replied, ''Of course, I don't know exactly how hard the limb hit him.'' He supposed it to be possible but highly improbable that there was a connection on account of freedom from headaches and convulsions before, and severe headaches and convulsions after, the blow.

In propounding the question to Dr. Harvey Johnston, it was explained that ''The lick was not from a falling limb, but from a limb that remained on a tree and brushed him * * * caused him to be in a temporary semi-conscious condition. * * * he did have some headaches.'' The attorney-referee then interposed to say that, as he recalled, the claimant was snaking a tree and a limb hit him. The doctor replied, ''The injury as described to me, in which it was not severe enough to cause him to lose any time from work, I do not believe would have been severe * * * would have attributed in any way to his death from the astrocytoma.'' On cross-examination, he expressed the opinion that ''Things that will stir up the tumor * * * will increase the chance of its spreading

\* \* \* something that would cut into it or tear into it \* \* \* I think that if a trauma would tear or produce hemorrhage of an astrocytoma tumor, that it could aggravate the condition of the patient having such tumor." And another answer, "So as I understand it, this trauma was severe enough only to have produced, at most, brain concussion, but not contusion or laceration of the brain."

From the hypothetical questions themselves and the answers of the doctors thereto it is clear that the severity of the blow, which McIntosh received, was greatly minimized. Instead of understanding that he was struck on the head by a limb, which knocked him at least semi-unconscious, they were given the impression that the limb merely *brushed* him, the blow being insufficient to cause a tear or contusion in the brain, and amounting to a mere concussion.

Hypothetical questions should assume a state of facts, which has been shown by the evidence of other witnesses or by the testimony of the expert himself. Jones On Evidence, Sec. 370, p. 693. There was no evidence in the record to show that McIntosh had merely been brushed by the limb. There is much difference between brush and strike. In common acceptation, strike means to hit with force; while brush means to pass lightly over or exert the slightest pressure against. Webster's New International Dictionary 2nd Ed. The nature or severity of the blow from the limb was the original landmark. When the point of beginning is uncertain, no one can feel certain that the established line is correct.

▉▉ ▉ Where the finding of the Commission on a disputed question of fact is supported by substantial evidence, the circuit court should not, of course, reverse its judgment, and neither will this Court. Sones v. Southern Lumber Company, 60 So. 2d 582, and other cases. But here, because of the erroneous assumption as to the severity of the blow and the lack of evidence

upon which to base the employer's assumption, the answers of the doctors as to the acceleration of growth of the tumor did not constitute substantial evidence. On the contrary, to sustain the acceleration, there stands the positive evidence of Dr. Neill, an outstanding brain specialist, who, from the history of the injury, his knowledge of the patient and information gained from examinations, studies, treatment, surgery, and personal knowledge, was of the definite opinion that the blow on the head accelerated the growth and development of the tumor, and precipitated McIntosh's death perhaps four to five years before it would have otherwise occurred.

When the evidence of the three doctors, who were called by the employer, is analyzed and compared with the testimony of Dr. Neill, for the reasons herein above stated, no substantial conflict appears. Each version, in its proper sphere, is doubtless correct. Compare M. T. Reed Construction Company v. Martin, 61 So. 2d 300 (Miss.), where one doctor, on the basis of his treatment, predicted that the claimant would sustain a 20% disability, whereas another doctor subsequently found from examination and treatment that the prediction did not come true and that the claimant had actually sustained a total loss of use of the leg.

Thus the orders of the attorney-referee and the Commission were against the overwhelming weight of the evidence, and were not supported by substantial evidence. Consequently, the circuit court was correct in reversing the cause and awarding the claims for death benefits.

It is unnecessary to deal with the question as to whether the circuit court erred in holding that objections to the hypothetical questions should have been sustained. Those objections were interposed on the question as to whether or not trauma would cause such a tumor. The issue was whether it would accelerate the growth. Proper

objections were not made on the vital issue. Consequently the answers went in, but they caused no harm.

The judgment of the circuit court is affirmed.

Affirmed.

*McGehee,* C. J., *Hall, Kyle* and *Holmes,* JJ., concur.