## A. De Weese Lumber Co., et al. *v.* Poole

No. 40462             May 6, 1957             94 So. 2d 791

*Vardaman S. Dunn*, Jackson, for appellants.

*W. A. Temple, H. C. (Mike) Watkins,* Meridian, for appellee.

ARRINGTON, J.

This appeal is by the A. DeWeese Lumber Company and the Employers' Mutual Liability Insurance Company from a judgment of the Circuit Court of Neshoba County reversing the order of the Workmen's Compensation Commission, which had affirmed the finding of the attorney-referee on a claim for compensation benefits by Ira Poole.

It is admitted that Ira Poole was employed and working for the appellant and that on July 16, 1953, he sustained a fracture of the tibia and fibula of the left leg; that the injury arose out of and in the course of his employment; that he had been paid compensation for a specified period of time at the rate of $24.53 per week. The sole question involved in this proceeding is to determine the degree of disability to the appellee's leg, since he contends that he is entitled to further temporary total benefits and medical care and treatment.

There were two hearings, the first was held in Philadelphia on February 24, 1956, and the second in Meridian on March 21, 1956 in order to take the testimony of Dr. Lowry Rush. The record discloses that after the injury to the appellee, he was treated at the Neshoba County Hospital; that the bones failed to heal properly, which resulted in a deformity of the leg, and although the appelle did some light work for three or four weeks, he was unable to continue; that on November 12, 1954, the appellant sent the appellee to the Rush Hospital in Meridian for treatment by Dr. Lowry Rush. After reporting to Dr. Rush on November 12, he returned to the hospital in Meridian on November 17 and there remained until November 30, 1954. While there, Dr. Rush performed an osteotomy on the tibia. In performing this operation, it was necessary to fracture the bone in order to straigsten it and according to the testimony of Dr. Rush, he operated on the larger bone by cutting the

bone and straightening it by the use of a peg bone
and the "Rush pin", which was necessary in order to
straighten the leg to some extent and to remove or shift
the weight from the knee joint. After the operation, a
cast was applied to the leg and he was advised to use
crutches; he returned at regular intervals for treatment
by Dr. Rush. On June 24, 1955, the doctor thought that
the bones had healed and that the removal of the pin
would be postponed for several months, and on July 2,
1955, he was temporarily discharged to return to full
activity, and was instructed to return in October for the
removal of the pin. It was the opinion of the doctor that
he had a "pretty good return of function in his leg."
Appellee returned to the hospital in October for the re-
moval of the pin and was finally discharged on October
27, 1955. Dr. Rush estimated his disability at 15 percent
and stated that he had not seen the claimant since that
time.

According to the appellee's testimony, he was unable
to work and was still suffering and he went to see Dr.
Caffey at Philadelphia, who examined him on January
30 and again on February 10, and again on the date of
the hearing, February 24, 1956. Dr. Caffey's testimony
was that the healing was incomplete and it would take
six months for the appellee to reach maximum recovery;
that appellee's disability to the body as a whole was 50
to 75 percent; that the leg was from 90 to 100 percent
disabled so far as manual labor was concerned.

As stated above, Dr. Rush had not seen or examined
the appellee since October 27, 1955, and testified that it
was possible for the appellee's condition to be worse
today than it was when he last saw him. Upon examina-
tion by the carrier's counsel as to whether there was any-
thing in his condition that would prevent him from re-
suming his normal occupation and function in the use of
his leg, Dr. Rush answered, "Of course, I can't answer

that question positively—it was my impression he could go back to heavy labor with his leg." Upon cross-examination, the doctor's testimony was in effect that in his opinion the operation was a success and the claimant could assume full activity by laboring in his former job; that he thought he could do so in July 1955, also that if his knee were involved and there was a loss of function, it would play a part in the overall evalutation.

As to the appellee's activity, the doctor testified that if he has not exercised and has used crutches, then it would swell and he would have thickness of the knee and loss of function. He was asked the following question:

"Q. Do you feel like you will be in a better position to evaluate his condition as of today if you examined him further?

"A. Of course, to evaluate his condition as of today, he would have to be examined today, but evaluating a patient's condition on the spur of the moment is not an easy task. If it is the desire of those concerned that I examine him, I would like for him to come to my office at a time when I could x-ray him and I would like to be requested to x-ray certain things in question. A lot of my questions today have been things I haven't been consulted about."

Counsel for the employer and carrier made a motion to recess the hearing pending further examination of Dr. Rush. The attorney-referee reserved ruling on the motion, stating: "I think where all the evidence shows inadequate disability and if it becomes apparent that such examination becomes necessary, it will be ordered."

Evidently the motion was overruled as no further examination by Dr. Rush appears in the record and the attorney-referee rendered an opinion on April 30, 1956, awarding the appellee permanent partial benefits based on fifteen percent loss of the use of his leg in the

amount of $24.53 for 26¼ weeks. The manner of proof as to disability in this case was substantially the same as in M. T. Reed Construction Co. v. Martin, 215 Miss. 472, 61 So. 2d 300. In that case, Dr. Daley, at the time of the discharge of the patient, was of the opinion that the disability did not exceed twenty percent. His basis for that conclusion was: "The bone was healed and the function was good. He thought there was not enough atrophy to prevent climbing and that there was no reason for pain. And, on that account, he did not include pain in arriving at the percent of disability. However, the doctor did not see or examine Martin any more after his discharge, and he conceded that, if he now has pain, it may last two or three years."

In other words, he predicted that nothing would occur in the future to cause disability to exceed twenty percent. On the other hand, it actually turned out, according to the evidence of Dr. Applewhite and the claimant, that the claimant did not work and was unable to work; that the use of the leg resulted in pain for which he had to take palliatives; and that this condition would remain permanent. Consequently, the benefits for the additional period were ordered to be paid.

Under the showing as made by Dr. Caffey and the claimant, there was actually no dispute as to the then condition of the appellee, namely, that the appellee was unable to work, and it would take six months for him to attain maximum recovery. Williams Bros. Co. v. McIntosh, 84 So. 2d 692; Masonite Corp. v. Fields, 91 So. 2d 282.

██ ██ The testimony of the doctors was not conflicting, as they were testifying about appellee's condition at different times. Manifestly, the attorney-referee should not have decided this matter until he had the benefit of such examination by Dr. Rush. ██ ██ The circuit court was therefore correct in reversing the commission and ordering the further payment of temporary

total disability, which is interpreted to mean until from a hearing it shall be determined that the claimant has reached maximum recovery and at which time the commission will then determine and award benefits for the permanent partial disability of the appellee.

Affirmed and remanded.

*McGehee, C. J.* and *Lee, Holmes* and *Ethridge, JJ.,* concur.